# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No.: 19-274

JONATHAN KNOTT and RICHARD KNOTT, individuals,

      Plaintiff,

v.

GENERAL MOTORS LLC, a Delaware limited liability company, CS AUTO CHEVSO, LLC d/b/a MIKE MAROONE CHEVROLET SOUTH COLORADO SPRINGS, a Florida limited liability company, and FIDELITY WARRANTY SERVICES, INC., a Florida corporation.

      Defendants.

## COMPLAINT AND JURY DEMAND

### INTRODUCTION

1. This is an action for actual damages brought by Jonathan Knott and Richard Knott (the "**Plaintiffs**"), individuals, against General Motors LLC, a Delaware limited liability company ("**GM**"), CS AUTO CHEVSO, LLC d/b/a Mike Maroone Chevrolet South Colorado Springs, a Florida limited liability company (the "**Dealership**"), and Fidelity Warranty Services, Inc. ("**Fidelity**") (collectively the "**Defendants**").  Plaintiffs bring this action to enforce the Magnuson Moss Warranty Act, 15 U.S.C. § 2301 et seq. ("**MMWA**"), the Colorado Uniform Commercial Code, Colo. Rev. Stat. § 4-1-101 et seq. ("**UCC**"), for breach of contract, and for fraudulent concealment and misrepresentation.

2. On or about November 11, 2017, Plaintiffs purchased a used 2016 GMC Sierra 2500 HD 4WD Crew Cab, VIN 1GT12TE81GF217644 (the "**Vehicle**").  Plaintiffs

requested and examined the Vehicle's Carfax report (the "**First Carfax**") prior to purchasing the Vehicle. The First Carfax that the Dealership provided indicated that the Vehicle had been sold at auction, but did not contain any information regarding the quality of the Vehicle. The Dealership further represented to Plaintiffs that the Vehicle was in good condition and had no known defects. Upon purchasing the Vehicle, Plaintiff Jonathan Knott noticed that the Vehicle would "surge" when he attempted to break. Concerned about this serious safety hazard, Plaintiff Jonathan Knott brought the Vehicle back to the Dealership in an attempt to repair the Vehicle. As time progressed, Plaintiffs discovered that the Dealership not only misrepresented the quality of the Vehicle, it also failed to disclose that GM had repurchased the Vehicle from the prior owner due to the engine surge issue. To add insult to injury, the Dealership then attempted to "buy off" the Plaintiffs by sending them checks for small sums of money in exchange for Plaintiffs' signatures on certain disclosure documents. The Dealership later back-dated these documents to make it appear as though the Dealership had complied with the law and timely disclosed the Vehicle's true condition. For its part, GM has refused to honor any number of warranties that the Dealership represented came with the Vehicle.

## JURISDICTION

3. This Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. §§ 2310(d)(1)(B) in that this is an action under the MMWA and the amount in controversy exceeds $50,000.00.

4. This Court has jurisdiction pursuant to 28 U.S.C. § 1332(a)(1) in that this is an action between citizens of different states and the amount in controversy exceeds $75,000.00.

5.  This Court has jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a) in that those claims are so related to the claims within this Court's original jurisdiction that they form part of the same case or controversy.

6.  Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) in that a substantial part of the events or omissions giving rise to the claims occurred in this District.

**PARTIES**

7.  Plaintiffs are individuals who reside in the County of Garfield, State of Colorado.

8.  GM is a Delaware limited liability company with a principal place of business at 300 Renaissance Center, Detroit, Michigan 48265, and a registered agent at 1900 West Littleton Boulevard, Littleton, Colorado 80120.

9.  The Dealership is a Florida limited liability company with a principal place of business at 230 North Academy Blvd., Colorado Springs, Colorado 80909, and a registered agent at 1570 Auto Mall Loop, Colorado Springs, Colorado 80920.

10. Fidelity is a Florida corporation with a principal place of business at 500 Jim Moran Boulevard, Deerfield Beach, Florida 33442, and a registered agent at 7700 East Arapahoe Road, Suite 220, Centennial, Colorado 80112.

11. Under the MMWA, a "supplier" is any person engaged in the business of making a consumer product directly or indirectly available to consumers. 15 U.S.C. § 2301(4).

12. GM is in the business of making vehicles directly or indirectly available to consumers and is, therefore, a supplier.

13. The Dealership is in the business of making vehicles directly or indirectly available to consumers and is, therefore, a supplier.

///

## FACTS

14. On or about November 11, 2017, Plaintiffs purchased the Vehicle.

15. The Vehicle is normally used for personal, family, or household purposes, and therefore, is a "consumer product". 15 U.S.C. § 2301(1).

16. The Vehicle was advertised and sold as a certified pre-owned vehicle ("**CPO**").

17. CPO vehicles cost a premium in comparison to used vehicles sold without a warranty.

18. A GM CPO vehicle comes with two factory-backed warranties: a six-year or 100,000 mile powertrain limited warranty (the "**Powertrain Warranty**"), and a twelve month or 12,000 mile bumper-to-bumper limited warranty (the "**Bumper-to-Bumper Warranty**").

19. In connection with the sale of the Vehicle, GM expressly promised that the Vehicle would meet a specified level of performance for five years or 100,000 miles, whichever comes first based on the original in-service date. GM also expressly agreed to refund, repair, replace, or take other remedial action with respect to the Vehicle in the event that the Vehicle fails to meet the specifications set forth in the Powertrain Warranty.

20. The Powertrain Warranty is a "written warranty". 15 U.S.C. § 2301(6).

21. At all times material hereto, the Powertrain Warranty covered the Vehicle.

22. In connection with the sale of the Vehicle, GM expressly promised that the Vehicle, bumper-to-bumper, would be defect free and meet a specified level of performance for twelve months or 12,000 miles, whichever comes first. GM also expressly agreed to refund, repair, replace, or take other remedial action with respect to the Vehicle in the event that the Vehicle fails to meet the specifications set forth in the Bumper-to-Bumper Warranty.

23. The Bumper-to-Bumper Warranty is a "written warranty". 15 U.S.C. § 2301(6).

24. At all times material hereto, the Bumper-to-Bumper Warranty covered the Vehicle.

25. In addition to the two factory-backed warranties that came with the Vehicle, Plaintiffs also purchased a vehicle service contract (the "**Contract**") on the same date that they purchased the Vehicle.

26. Fidelity is the service company and administrator of the Contract.

27. Under the Contract, Fidelity is required to cover the cost to repair any powertrain related issues or issues relating to the Vehicle's assemblies.

28. At all times material hereto, the Vehicle Service Contract covered the Vehicle.

29. Plaintiffs also purchased a car care service plan (the "**Service Plan**") on the same date that they purchased the Vehicle.

30. Fidelity is the service company and administrator of the Service Plan.

31. Under the Service Plan, Fidelity is required to cover the cost of all routine maintenance services.

32. At all times material hereto, the Service Plan covered the Vehicle.

33. Plaintiffs asked for and examined the First Carfax prior to purchasing the Vehicle.

34. The First Carfax is dated November 11, 2017.

35. The First Carfax indicates that the Vehicle had a prior owner and was sold at auction.

36. The First Carfax contains no other information concerning the quality of the Vehicle.

37. On information and belief, the Dealership knew of the Vehicle's issues.

38. The Dealership did not disclose to Plaintiffs any known issues concerning the Vehicle.

39. Instead, the Dealership represented to Plaintiffs that the Vehicle was in good condition.

40. Shortly after purchasing the Vehicle, Plaintiff Jonathan Knott noticed that the Vehicle would "surge" when Plaintiff Jonathan Knott attempted to brake.

41. On or about November 27, 2017, Plaintiff Jonathan Knott took the Vehicle to the Dealership.

42. The Dealership noted the surging issue and attempted to repair the Vehicle.

43. On or about November 28, 2017, Plaintiff picked up the Vehicle at the Dealership.

44. The Vehicle continued to surge.

45. At some point, the date of which is unknown, a representative from the Dealership informed Plaintiffs that the Vehicle was not actually a CPO vehicle. No refund was offered and no other explanation was given.

46. On or about December 23, 2017, Plaintiff Jonathan Knott was driving the Vehicle when the Vehicle surged, slid over a bump on the road, and the curtain airbags deployed.

47. The airbag deployment caused substantial damage to the Vehicle.

48. On or about December 23, 2017, Plaintiff Jonathan Knott brought the Vehicle to the Dealership to repair the damage caused by the airbag deployment.

49. On or about December 28, 2017, a representative from the Dealership informed Plaintiffs that he was sending a package with documents for Plaintiffs to sign.

50. Plaintiff Jonathan Knott contacted GM and a GM senior service advisor opened a warranty claim.

51. On or about January 4, 2018, GM denied the warranty claim.

52. When Plaintiff Jonathan Knott questioned GM about the denial, GM informed Plaintiff Jonathan Knott only that GM's decision was final.

53. On or about January 18, 2018, a representative from the Dealership informed Plaintiffs that the package containing the above-mentioned documents would be arriving the next day.

54. The representative further informed Plaintiffs that, once Plaintiffs signed and returned the documents, the Dealership would send them a check for $500.00.

55. On or about January 19, 2018, Plaintiff Jonathan Knott received a FedEx envelope from the Dealership.

56. The FedEx envelope contained the following documents:

   a. A Carfax report dated December 12, 2017 (the "**Second Carfax**");

   b. A vehicle inspection form dated July 27, 2017 indicating that GM repurchased the Vehicle because of the engine surge issue;

   c. A repair order invoice for the Vehicle, dated September 6, 2017, detailing the engine surge issue; and

   d. A GM Resale Disclosure Notice of Nonconformity (the "**Disclosure Notice**").

57. The Second Carfax contains information that is materially different from the First Carfax.

58. The Second Carfax indicates that the Vehicle was sold at auction and discloses that the Vehicle was a "manufacturer buyback".

59. A manufacturer will buyback or repurchase a vehicle when it is required to do so under state or federal laws. Often, a buyback or repurchase is done when a vehicle is

defective and the manufacturer is unable to conform the vehicle to the manufacturer's warranty within a specified period of time.

60. This information was omitted from the First Carfax. The First Carfax discloses only that the Vehicle was sold at auction.

61. The Disclosure Notice contains information relating to the buyback of the Vehicle, as well as information regarding the warranty that should apply to the next purchaser of the Vehicle.

62. Plaintiffs did not see, sign, or know about the Disclosure Notice prior to the purchase of the Vehicle.

63. On or about January 20, 2018, at the Dealership representative's direction, Plaintiff Richard Knott signed, dated, and returned the Disclosure Notice.

64. The Dealership altered the date on Plaintiff Richard Knott's signature line in an attempt to make it appear as though the Dealership disclosed the buyback information prior to the purchase of the Vehicle.

65. On or about February 23, 2018, Plaintiff Jonathan Knott received a $500.00 check from the Dealership.

66. The paperwork that came with the check included one sentence which stated: "check to customer for GM buyback." No other information was included.

67. The Dealership did not disclose to Plaintiffs that the Vehicle was a buyback vehicle prior to the sale of the Vehicle.

68. The Dealership's concealment of this fact induced Plaintiffs to purchase the Vehicle.

69. Plaintiffs would not have purchased the Vehicle is they had known that the Vehicle was a buyback vehicle.

70. Plaintiffs have been injured as a result of the Dealership's concealment.

71. On or about February 21, 2018, Plaintiff Jonathan Knott picked up the Vehicle from the Dealership.

72. Plaintiff Jonathan Knott paid $6,391.17 to repair the damage to the Vehicle caused by the airbag deployment.

73. The Vehicle repairs are covered under the Contract, the Bumper-to-Bumper Warranty, and the Powertrain Warranty.

74. GM and the Dealership both refused to cover the cost of the repairs.

75. Fidelity did not cover the cost of the repairs.

76. The Vehicle continued to surge after the Dealership completed the repairs.

77. On or about March 1, 2018, Plaintiff Jonathan Knott brought the Vehicle to Berthod Motors, Inc. ("**Berthod**") for a routine maintenance check.

78. Under the terms of the Service Plan, Fidelity is required to cover the cost of routine maintenance.

79. Fidelity did not cover the cost of this routine maintenance check.

80. Plaintiff Jonathan Knott paid $115.22 for this routine maintenance check.

81. On or about May 1, 2018, Plaintiff Jonathan Knott brought the Vehicle to Berthod for a routine maintenance check.

82. Under the terms of the Service Plan, Fidelity is required to cover the cost of routine maintenance.

83. Fidelity did not cover the cost of this routine maintenance check.

84. Plaintiff Jonathan Knott paid $139.66 for this routine maintenance check.

85. On or about July 18, 2018, Plaintiff Jonathan Knott again brought the Vehicle to the Dealership in an attempt to address the surge issue.

86. The Vehicle repairs are covered under the Contract, the Bumper-to-Bumper Warranty, and the Powertrain Warranty.

87. GM and the Dealership both refused to cover the full cost of the repairs.

88. Fidelity did not cover the cost of the repairs.

89. Plaintiff Jonathan Knott paid a total of $1,606.65 for the repairs.

90. The repairs should have cured the Vehicle's surging issue.

91. The Vehicle continued to surge after the Dealership completed the repairs.

92. On or about November 8, 2018, Plaintiffs received a second check from the Dealership in the amount of $1,049.00.

93. The paperwork that came with the check included one sentence which stated: "product cancellation for Jonathan Knott."  No other information was included.

94. According to the Dealership, the check was intended to be a refund for the Service Plan, but this refund was not requested by either Plaintiff, nor did either Plaintiff authorize any such cancellation.

95. The Dealership has failed to remedy the defects in the Vehicle within a reasonable time.

96. Plaintiffs are entitled to elect their remedies under the MMWA.  15 U.S.C. § 2304(a).

## COUNT I
### (Breach of Colorado Automotive Dealer Licensing Law against the Dealership)

97. Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth herein.

98. Colorado automotive dealer licensing law provides that "[i]f any person suffers loss or damage by reason of any fraud practiced on such person or fraudulent representation made to such person by a licensed dealer or one of the dealer's salespersons acting for the dealer on such dealer's behalf or within the scope of the employment of the salesperson or suffers any loss or damage by reason of the violation by such dealer or

salesperson of any of the provisions of this part 1 that are designated by the board by rule, whether or not such violation is the basis for denial, suspension, or revocation of a license, such person shall have a right of action against the dealer, such dealer's motor vehicle salespersons, and the sureties upon their respective bonds. The right of a person to recover for loss or damage as provided in this subsection (1) against the dealer or salesperson shall not be limited to the amount of their respective bonds." Colo. Rev. Stat. § 44-20-131(1).

99. The same law prohibits the "[w]illful misrepresentation, circumvention, or concealment of or failure to disclose, through whatsoever subterfuge or device, any of the material particulars or the nature thereof required to be stated or furnished to the buyer . . . ." Colo. Rev. Stat. § 44-20-121(3)(h).

100. "Material particulars" means "those details concerning a vehicle for sale that are essential or necessary for a reasonable prospective Buyer to know prior to making the decision to buy or not to buy a vehicle." 1 Colo. Cod. Reg. § 205-1(A).

101. The Dealership concealed or failed to disclose "material particulars".

102. The Dealership willfully failed to disclose all material particulars required to be stated or furnished to Plaintiffs.

103. As a result, Plaintiffs have been damaged in an amount to be determined at trial.

## COUNT II
**(Fraudulent Concealment and Fraudulent Misrepresentation against the Dealership)**

104. Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth herein.

105. The Dealership knew or should have known that the Vehicle was a warranty buy-back vehicle.

106. The Dealership concealed, failed to disclose, or misrepresented the fact that the Vehicle was a warranty buy-back Vehicle.

107. The Dealership concealed, failed to disclose, or misrepresented the fact that Vehicle's surge issue was a known defect.

108. The Dealership had a duty to disclose these facts.

109. The facts were material.

110. The Dealership concealed, failed to disclose, or misrepresented these facts with the intent that the Plaintiffs take a course of action that they might not take if they knew the actual facts.

111. Plaintiffs took such a course of action on the assumption that the concealed, undisclosed, or misrepresented facts did not exist or were different from what they actually were.

112. Plaintiffs' reliance on this concealment, nondisclosure, or misrepresentation was reasonable.

113. Plaintiffs' reliance caused them damages in an amount to be determined at trial.

### COUNT III
**(Breach of Contract against Fidelity)**

114. Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth herein.

115. The Contract and the Service Plan are valid and binding obligations of Fidelity.

116. Plaintiffs performed or substantially performed all of their obligations under the Contract and the Service Plan.

117. Fidelity failed to perform under the Contract and the Service Plan by, among other things, failing to pay for the cost of the Vehicle's repairs or pay for the cost of routine maintenance.

118. As a result of Fidelity's breach of the Contract and the Service Plan, Plaintiffs have been damaged in an amount to be determined at trial.

### COUNT IV
### (Breach of the Magnuson Moss Warranty Act, 15 U.S.C. § 2301 et seq. against the Dealership and GM)

119. Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth herein.

120. Under the MMWA, a "consumer product" is any tangible personal property normally used for personal, family, or household purposes.  15 U.S.C. § 2301(1).

121. The Vehicle is tangible personal property and is used for personal, family, or household purposes.

122. The Vehicle is a consumer product.

123. Under the MMWA, a "consumer", among other things, is a buyer of any consumer product.  15 U.S.C. § 2301(3).

124. Plaintiffs are consumers.

125. Under the MMWA, a "written warranty" is any written affirmation of fact or written promise made in connection with the sale of a vehicle "by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that such material or workmanship is defect free or will meet a specified level of performance over a specified period of time, or any undertaking in writing in connection with the sale by a supplier of a [vehicle] to refund, repair, replace, or take other remedial action with respect to such product in the event that such product fails to meet the specifications set forth in the undertaking . . . ." 15 U.S.C. §§ 2301(6)(A-B)).

126. The Bumper-to-Bumper and Powertrain Warranties (the "**Warranties**") are written affirmations that the Vehicle is defect free or will meet a specified level of performance over a specified period of time.

127. The Warranties are an undertaking by GM promising to refund, repair, or replace the Vehicle in the event that the Vehicle fails to meet the specifications set forth in the undertaking.

128. The Warranties are "written warranties" under the MMWA.

129. The Dealership and GM breached the Warranties when it failed to repair the defects that impair the promised condition and performance of the Vehicle within a reasonable time.

130. The Dealership and GM breached the Warranties when they failed to refund, repair, replace, or take other remedial action with respect to the non-conforming Vehicle.

131. As a result of The Dealership and GM's breach of the Warranties, Plaintiffs are entitled to damages, including attorney fees and costs under the Magnuson-Moss Warranty Act, in an amount to be determined at trial.  15 U.S.C. § 2310(d)(2).

132. In addition, Plaintiffs are entitled to treble damages for The Dealership and GM's willful failure to perform or cause to be performed a written warranty made with respect to the Vehicle.  Colo. Rev. Stat. §§ 44-20-124(1)(a), -20-131.

## COUNT V
**(Breach of Express Warranties and the Implied Warranty of Merchantability, Colo. Rev. Stat. § 4-2-101 et seq. against the Dealership and GM)**

133. Plaintiffs incorporate by reference all of the foregoing allegations as though fully set forth herein.

134. Under the UCC, the seller of goods who is also a merchant with respect to the goods sold warrants that the goods are merchantable.  Colo. Rev. Stat. § 4-2-314(1).

135. To be merchantable, the goods must be such that they pass without objection in the trade under the contract description; are fit for the purposes for which they are ordinarily used; and conform to the promise or affirmations of fact made on the container or label if any. Colo. Rev. Stat. § 4-2-314(2).

136. The Dealership and GM are people who sell or contract to sell goods and therefore, are "sellers". Colo. Rev. Stat. § 4-2-103(1)(d).

137. The Dealership and GM are people who deal in goods of the kind and hold themselves out as having knowledge or skills peculiar to the practices or goods involved in the transaction at issue here, and therefore, are "merchants". Colo. Rev. Stat. § 4-2-104(1).

138. The Dealership and GM warranted that the Vehicle was merchantable.

139. The Vehicle does not pass without objection in the trade under the contract description.

140. The Vehicle is not fit for the purposes for which automobiles are ordinarily used.

141. The Vehicle does not conform to the promises or affirmations of fact made on the label.

142. The Dealership and GM have breached the implied warranty of merchantability.

143. Under Colorado law, an express warranty is created when a seller makes any affirmation of fact or promise to the buyer which relates to the goods and becomes part of the basis of the bargain. Colo. Rev. Stat. § 4-2-313(1)(a).

144. The Dealership and GM warranted that the Vehicle was a CPO.

145. The Dealership and GM warranted that the Vehicle would operate as designed and would be defect free.

146. The Vehicle does not operate as designed and is not defect free.

147. Plaintiffs notified The Dealership and GM of the Vehicle's non-conformities.

148. Plaintiffs are entitled to damages (including incidental and consequential damages) and treble damages for willfulness in an amount to be proved at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Jonathan Knott and Richard Knott pray for relief and judgment against Defendants as follows:

1. Awarding Plaintiffs actual damages in the amount of $67,941.80;

2. Awarding Plaintiffs trebled damages in the amount of $203,825.40;

3. Awarding Plaintiffs reasonable attorney fees and costs incurred in this action;

4. Awarding Plaintiffs pre-judgment and post-judgment interest as may be allowed under the law; and

5. Awarding such other and further relief as the Court may deem just and proper.

## TRIAL BY JURY

Plaintiff is entitled to and hereby demands a trial by jury.

Dated: January 31, 2019

Respectfully submitted,

/s/ Katherine Russell
Daniel J. Vedra
Katherine Russell
Vedra Law LLC
1435 Larimer St. Suite 302
Denver, CO 80202
Phone: (303) 937-6540
Fax: (303) 937-6547
Email: dan@vedralaw.com
Email: kate@vedralaw.com